UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| VAN DUZER LANG, *et al.*,<br><br>                             *Plaintiffs*,<br><br>v.<br><br>PATIENTS OUT OF TIME, *et al.*,<br><br>                             *Defendants*. | CASE NO. 3:20-cv-00055<br><br>MEMORANDUM OPINION AND ORDER<br><br>JUDGE NORMAN K. MOON |

Plaintiffs Jeanne Van Duzer Lang and Laramie Van Duzer Silber and Defendants Patients Out of Time, its unpaid directors, and Mary Lynn Mathre have filed cross motions for summary judgment. The Court will grant, in part, Defendants' motion for summary judgment, concluding that the Virginia Nonstock Corporation Act shields the unpaid directors from liability.[1] However, the Court will deny Defendants' motion on all other grounds. The Court will also grant, in part, Plaintiffs' motion for summary judgment, determining that, given the undisputed facts, Plaintiffs should succeed on their New Jersey Wage Payment Law claim as a matter of law. The Court will deny the rest of Plaintiffs' motion for summary judgment.

## BACKGROUND

Patients Out of Time ("POT") is a nonprofit organization created "to educate all disciplines of health care professionals, and the public at large, about medical cannabis." Dkt. 1 (Ex. A) ¶ 4. Defendant Directors and Ms. Mathre were uncompensated members of the POT

---

[1] Defendant Directors include Michael Aldrich, Denis Petro, Irvin Rosenfeld, Melanie Dreher, and Dustin Sulak. They will be dismissed from this lawsuit.

1

Board of Directors at all relevant times.[2] Plaintiff Laramie Van Duzer Silber was Chief Operating Officer ("COO") of POT from January 2015 through May 2019, Plaintiff Jeanne Van Duzer Lang was Chief of Staff during that period, and the POT Board of Directors approved their hiring. Dkt. 157 (Ex. A) at 47, 60–62, 67–68; *id.* (Ex. B); *id.* (Ex. C).

Plaintiffs and Defendant POT executed contracts governing the terms of Plaintiffs' employment;[3] however, there is some dispute as to those terms.[4] Nonetheless, it is agreed that the contracts called for Plaintiffs to submit monthly invoices. Dkt. 159 (Ex. 12); *id.* (Ex. 13). But Plaintiffs argue that the contracts "did not bar compensation for which invoices were not submitted." Dkt. 163 at 26. The parties further dispute whether Plaintiffs submitted these invoices monthly and whether all payments were made.[5]

Plaintiffs worked solely for POT between January 2015 and May 2019. Dkt. 157 (Ex. A) at 52, 107–08. They reported to Mathre about their work. *Id.* at 46–47, 109, 206–07. The parties, however, debate whether Mathre "controlled" Plaintiffs' work, though they agree that Mathre provided direction to Plaintiffs.[6] Regardless, together, Mathre and Plaintiffs constituted POT's executive committee—an unofficial, informal body that governed the day-to-day operations of POT. Dkt. 157 (Ex. A) at 50–51, 63–64, 155–56.

---

[2] Amend. Compl. ¶¶ 7–13; Dkt. 159 (Ex. 1) ¶ 7; *id.* (Ex. 2) ¶ 6; *id.* (Ex. 3) ¶ 7; *id.* (Ex. 4) ¶ 6.

[3] Dkt. 159 (Ex. 12); *id.* (Ex. 13); Dkt. 143 ¶ 15; Dkt. 157 (Ex. A) at 47, 60–62, 67–68.

[4] Defendants explain that Plaintiffs worked under modified conditions after their written contracts ended, and the modifications distinguished between paid work and unpaid volunteer work, in addition to providing that payment would be contingent on fund availability. Dkt. 164 at 3–4 (citing Dkt. 159 (Ex. 6) at 169:25–170:5; *id.* (Ex. 7) at 76:2–5; *id.* (Ex. 27) at 17:21–18:6; *id.* (Ex. 5) at 74:11–13; Dkt. 164 (Ex. C) at 91:24–92:12).

[5] *See* Dkt. 159 (Ex. 8) at 55:18–57:21, 59:15–16, 111:20–112:12; *id.* (Ex. 9) at 13:2–20, 17:6–24:13, 29:15–33:9.

[6] *See* Dkt. 157 (Ex. A) at 46–47, 109; Dkt. 164 (Ex. B) at 11:13–12:14; Dkt. 159 (Ex. 12); *id.* (Ex. 13).

In March 2019, Plaintiffs allegedly spoke to Mathre about law and public policy violations they believed Mathre and POT had committed. *Id.* (Ex. A) at 73; *id.* (Ex. F).[7] Specifically, on March 12, 2019, Plaintiffs went to Tallahassee, Florida to meet Mathre and tell her they were resigning from POT, emphasizing their concerns about law and policy violations.[8] As a result of this meeting, on April 27, 2019, Mathre emailed the POT Board a Memorandum from the Executive Committee and a Memorandum of Understanding ("MOU"). *Id.* (Ex. H); *id.* (Ex. I); *id.* (Ex. J). The Memorandum from the Executive Committee to the Board communicated details of the violations of state and federal law Plaintiffs alleged that POT had committed. *Id.* (Ex. H); *id.* (Ex. J). Meanwhile, the MOU put forward a process POT could follow to achieve compliance with existing laws.[9] Dkt. 157 (Ex. I). Plaintiffs continued to work for POT after the March 12, 2019 meeting. *Id.* (Ex. D); *id.* (Ex. E); *id.* (Ex. M).

Mathre, however, eventually decided to terminate Plaintiffs' employment.[10] She announced to the Board, by email on May 6, 2019, that terminating Plaintiffs' employment would be on the next board meeting's agenda. Dkt. 157 (Ex. N). In that email, Mathre wrote: "I did sign the [aforementioned] MOU after hours of discussion and under duress since Jeanne and

---

[7] The parties dispute this: Defendants argue that Plaintiffs never identified the specific laws being violated; in fact, they contend no laws were being violated. Dkt. 164 at 4. In contrast, Plaintiffs imply that they were concerned about tax code violations. *See, e.g.*, Dkt. 157 at 16 ("Mathre's response email to Laramie made it clear that Mathre and POT were willing to flout IRS requirements, pay people off the books and remain out of compliance while seeking funding as a tax-exempt organization.").

[8] *Id.* (Ex. A) at 179–80; *id.* (Ex. D) at 13–14; *id.* (Ex. G) at P000847; *see also id.* (Ex. E) at P000827.

[9] For their part, Defendants explain that "[t]he process outlined in the MOU was premised on a violation of [POT]'s Bylaws, and did not address any actual violations of federal or state law." Dkt. 164 at 6.

[10] Dkt. 159 (Ex. 5) at 21:3–6; *id.* (Ex. 6) at 129:14–130:2; *id.* (Ex. 1) ¶¶ 8–10; *id.* (Ex. 3) ¶¶ 8–10; *id.* (Ex. 4) ¶¶ 7–9.

Laramie had actually put in writing that we were out of compliance." *Id.* (Ex. M). Mathre also raised performance-related issues about them.[11] Plaintiffs, however, dispute this.[12] Nevertheless, on May 24, 2019, Mathre emailed Laramie: "your contract with [POT] is ended." Dkt. 157 (Ex. O). She also informed Jeanne, by letter dated May 25, 2019, that her "contract with [POT] is ended." *Id.* (Ex. P).

Shortly after Plaintiffs' dismissal, the Board received reports from Plaintiffs,[13] a POT donor,[14] and POT's counsel[15] discussing POT's alleged noncompliance with state and federal law.[16] But the Board itself did not take any action regarding Plaintiffs' termination. In any event, Plaintiffs contend that their employment ended in May 2019. *Id.* (Ex. O); *id.* (Ex. P).

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable [fact finder] could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

---

[11] Dkt. 159 (Ex. 14); *id.* (Ex. 15); *id.* (Ex. 16) at 3–4; *id.* (Ex. 28).

[12] Plaintiffs explain that the exhibits cited are Plaintiff Laramie's emails objecting to Mathre's conduct. Dkt. 163 at 27. Plaintiffs further argue that "[i]t is no coincidence that Dreher suggested in an email dated May 7, 2019, that Mathre create a performance related issue to cover her retaliation." *Id.* (citing Dkt. 157 (Ex. N)). Nonetheless, it appears the emails at issue could be construed as indicating Mathre raised performance-related issues about Plaintiffs.

[13] *Id.* (Ex. Q).

[14] *Id.* (Ex. G).

[15] *Id.* (Ex. S).

[16] For example, POT's counsel raised issues with Roger Grant: "[Camera crewman] Roger's insistence on being paid in cash and [Mathre's] willingness to do so, despite being repeatedly warned of the potentially dire legal consequences." *Id.* (Ex. S) at 5.

The moving party bears the burden of establishing that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, it must present sufficient evidence such that a reasonable fact finder could find by a preponderance of the evidence for the non-movant. *See Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48 F.3d 810, 818 (4th Cir. 1995). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc.*, 888 F.3d at 659.

When cross-motions for summary judgment are before a court, a court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Defs. of Wildlife v. N.C. DOT*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007) (internal quotation marks omitted)).

## ANALYSIS

**I.   New Jersey law applies to Plaintiffs' substantive claims. Implementing New Jersey Law, the Court will grant Plaintiffs' summary judgment motion as to the Wage Payment Law but deny both Plaintiffs' and Defendants' summary judgment motions as to the other substantive claims.**

Like at the motion to dismiss stage, Dkt. 12 at 27–41, Defendants insist Virginia law should apply to Plaintiffs' substantive legal claims. Dkt. 159 at 14–20. Again, the Court will reject Defendants' argument, deeming it precluded by the law of the case doctrine. Then, reaching the merits of Plaintiffs' substantive claims, the Court will grant Plaintiffs' summary

judgment motion as to the New Jersey Wage Payment Law but deny both Plaintiffs' and Defendants' summary judgment motions as to the other substantive claims.

> a. ***The law of the case doctrine counsels that New Jersey law should continue to apply to Plaintiffs' Wage Payment Law ("WPL"), Conscientious Employee Protection Act ("CEPA"), and breach of contract claims.***

While Defendants aver that Virginia law applies to Plaintiffs' substantive legal claims, it is significant that this Court already applied New Jersey law at the motion to dismiss stage. Dkt. 66 at 3–6. When a decision establishes "the law of the case," it "must [usually] be followed in all subsequent proceedings in the same case in the trial court or on a later appeal," unless one of three exceptions is met: "(1) a subsequent trial [or other proceeding] produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988) (internal citation omitted); *see also, e.g.*, *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009).

> The Fourth Circuit has held:
>
> The law-of-the-case doctrine recognizes that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' *But it poses no bar to the assessment of past holdings based on a different procedural posture when, as is the case in the progression from review of a motion to dismiss to a motion for summary judgment, that later review expands the court's inquiry based on development of actual facts underlying a plaintiff's claims. . . . [T]he law of the case doctrine also acknowledges that different facts will lead to a different legal analysis to which the doctrine cannot apply.*

*Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (emphasis added) (internal citations omitted). Put differently, "denials of motions to dismiss[ ] remain open to trial court reconsideration, and do not constitute the law of the case." *Plotkin v. Lehman*, No. 98-1638, 1999 WL 259669, at *1 (4th Cir. Apr. 30, 1999) (per curiam) (quoting *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994)). However, "when the facts alleged in a complaint are subsequently proven during

discovery[,] … the law-of-the-case doctrine [will] continue to govern how the law applies to those facts." *Graves*, 930 F.3d at 318 (citing *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 804 F.3d 646, 665–66 (4th Cir. 2015)). It is only when "[d]iscovery produce[s] substantially different facts" that "the law-of-the-case doctrine will no longer constrain the court's review." *Graves*, 930 F.3d at 318 (citation omitted).

Here, Defendants have not provided any persuasive, new material facts from discovery to support their contention that the Court's prior decision that New Jersey law applies is not the law of the case. Indeed, the only "new" facts to which Defendants point are (1) a discussion Plaintiffs had with a nonprofit lawyer about Virginia law and (2) a document containing an error that Mathre filed in Virginia. Dkt. 165 at 10. Neither shifts the Court's analysis. So, for the reasons given in the Court's July 2021 Order, Dkt. 66 at 2–6, New Jersey law still applies to Plaintiffs' substantive claims.

> **b. Applying New Jersey law, the Court grants Plaintiffs' summary judgment motion as to the WPL claim but denies both Plaintiffs' and Defendants' summary judgment motions as to the other substantive claims.**[17]

Plaintiffs bring their WPL and breach of contract claims based on Defendants' alleged failure to pay appropriate wages in a timely fashion. They bring their CEPA claim based on Defendants' alleged decision to terminate Plaintiffs' employment for objecting to and reporting on POT's failure to comply with fundraising and federal tax law. Amend. Compl. ¶¶ 173–88. Defendants rebut that Plaintiffs are not protected by either the WPL or CEPA; they also assert that Plaintiffs, not Defendants breached the contracts at issue. The Court will grant Plaintiffs'

---

[17] For reasons stated below, *see* discussion *infra* Section II, Defendant Directors will be granted immunity. So, the only defendants at issue in this section are Mathre and POT.

summary judgment motion as to Defendants' liability on the WPL claim. But the Court will deny Plaintiffs' and Defendants' summary judgment motions as to Plaintiffs' remaining claims.

> i. *Summary judgment will be awarded to Plaintiffs on their WPL claim.*

To hold Defendants liable under the WPL, the Court must make three findings: (1) POT and Mathre were employers, as defined by the statute, of Plaintiffs; (2) Plaintiffs were employees under the statute; and (3) Defendants violated the statute. N.J. Stat. Ann. § 34:11-4.1 *et seq.* In the present case, all three requirements are met, so the Court will grant summary judgment for Plaintiffs on this count.

First, Mathre and POT were employers under the WPL. The WPL defines an employer as "any individual, partnership, association, joint stock company, trust, [or] corporation … employing any person in this State." N.J. Stat. Ann. § 34:11-4.1(a). In addition, it explicitly notes that "[f]or the purposes of this act the officers of a corporation and any agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation." *Id.* These definitions encompass both Mathre and POT.

Second, the Court must consider whether Plaintiffs were employees or independent contractors under the WPL. The WPL defines an employee as "any person suffered or permitted to work by an employer, except that independent contractors and subcontractors shall not be considered employees." *Id.* § 34:11-4.1(b). The Supreme Court of New Jersey has adopted a three-part test—derived from New Jersey's Unemployment Compensation Law, *id.* § 43:21-19—to ascertain whether a worker is an independent contractor or employee for WPL purposes. An individual is considered an independent contractor if the following elements are met:

> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

>  (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>  (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

*Hargrove v. Sleepy's, LLC*, 220 N.J. 289, 305 (2015) (quoting N.J. Stat. Ann. § 43:21-19(i)(6)). "'[F]ailure to satisfy any one of the three criteria results in an 'employment' classification.'" *Id.* (quoting *Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor*, 125 N.J. 567, 581 (1991)).

Defendants cannot satisfy all three criteria; indeed, they fail to satisfy two prongs of the test. True, Defendants allege that Plaintiffs directly contradict that they were under Mathre or POT's control by contending that Plaintiffs "engaged in running" POT.[18] Dkt. 164 at 9. But even if Defendants are correct that they did not control Plaintiffs' work—a fact which is disputed, *see* Dkt. 166 at 8, there is no genuine issue of material fact that Plaintiffs were not "engaged in an independently established trade, occupation, profession or business;" they were also not working "outside the usual course of [POT's] business." N.J. Stat. Ann. § 43:21-19(i)(6)(B–C). First, both Plaintiffs worked exclusively for POT in roles Mathre dictated—hardly the employment situation of independent contractors. Dkt. 157 at 12. Additionally, they completed administrative work and conference planning, not the unrelated tasks one would expect from independent contractors. Dkt. 157 (Ex. A) at 43, 53. Defendants, accordingly, cannot satisfy all the *Hargrove* factors; Plaintiffs were thus employees under the statute.

Finally, the Court must determine whether Defendants violated the WPL. The WPL requires employers to pay employees the full wages due to them at least twice during the

---

[18] Defendants also point out that Plaintiffs' contracts classify them as "contractors." Dkt. 159 at 11. But the contracts' language matters little to the analysis: the Court "must look beyond the employment contract and the payment method to determine the true nature of the [employment] relationship." *E. Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev.*, 251 N.J. 477, 496 (2022) (citation omitted).

calendar month on regular pay days designated in advance. N.J. Stat. Ann. § 34:11-4.2. Indeed, it is illegal for an employer to contractually deviate from this requirement:

> It shall be unlawful for any employer to enter into or make any agreement with any employee for the payment of wages of any such employee otherwise than as provided in this act, except to pay wages at shorter intervals than as herein provided, or to pay wages in advance. Every agreement made in violation of this section shall be deemed to be null and void, and the penalties in this act provided may be enforced notwithstanding such agreement; and each and every employee with whom any agreement in violation of this section shall be made by any such employer, or the agent or agents thereof, shall have a right of civil action against any such employer for the full amount of his wages in any court of competent jurisdiction in this State.

*Id.* § 34:11-4.7.

In the case at hand, the invoicing provision in Plaintiffs' contracts with POT, requiring Plaintiffs to invoice POT for work performed, violated the WPL. Defendants describe this requirement as "a necessary prerequisite to payment per the contracts' terms." Dkt. 159 at 9. Plaintiffs would not be paid if they did not submit an invoice first. Extrapolating from this explanation, if Plaintiffs, for example, did not invoice any hours for a particular month, they would not be paid for that month. That will not do under New Jersey law: the WPL sets the floor for how often employees must be paid—twice a month. *See* N.J. Stat. Ann. § 34:11-4.2. The invoicing requirement in Plaintiffs' contracts necessarily breaches that floor. So, as the invoicing requirement is an "agreement made in violation of [the WPL]," it is "null and void," and Plaintiffs, as a result, have "a right of civil action against [Defendants] for the full amount of [their] wages." *Id.* § 34:11-4.7.

In sum, Plaintiffs' motion for summary judgment as to their WPL claim is granted on the issue of liability. However, as there is a dispute over the wages that are owed to Plaintiffs, Dkt. 159 at 24–25, a jury must still determine the appropriate damages under the WPL.

> ii. *The Court will deny both Plaintiffs' and Defendants' summary judgment motions as to CEPA.*

Plaintiffs claim to be whistleblowers who are entitled, as a matter of law, to the protections of CEPA. Defendants, meanwhile, attack Plaintiffs' CEPA claim on three grounds: (1) Plaintiffs are not employees under the statute, (2) Plaintiffs are not members of the class of individuals CEPA was designed to protect, and (3) Plaintiffs were not retaliated against. Despite Plaintiffs' request and Defendants' protests, the Court will deny both summary judgment motions and allow Plaintiffs' CEPA claim to go to a jury.

First, it is unclear whether Plaintiffs are employees under CEPA's specific terms. CEPA defines an "employee" as "any individual who performs services for and under the control and direction of an employer for wages or other remuneration." N.J. Stat. Ann. § 34:19-2(b). Significantly, this definition of employee is broader than the WPL's. The Supreme Court of New Jersey has noted that "the definition does not exclude, explicitly, persons who are designated as independent contractors." *D'Annuzio v. Prudential Ins. Co. of Am.*, 192 N.J. 110, 121 (2007). Indeed, the Supreme Court of New Jersey has stated:

> A reasonable application of CEPA's definition of 'employee' should include adjustment for the modern reality of a business world in which professionals and other workers perform regular or recurrent tasks that further the business interests of the employer's enterprise, notwithstanding that they may receive remuneration through contracts instead of through the provision of wages and benefits. Therefore, in order that CEPA's scope fulfill its remedial promise, *the test for an 'employee' under CEPA's coverage must adjust to the specialized and non-traditional worker who is nonetheless integral to the business interests of the employer*.

*Id.* at 124–25 (emphasis added). It utilizes the following factors to determine if a plaintiff qualifies as an employee:

> (1) the employer's right to control the means and manner of the work performance; (2) the kind of occupation—supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8)

>whether there is an annual leave; (9) whether the work is an integral part of the business of the 'employer;' (10) whether the worker accrues retirement benefits; (11) whether the 'employer' pays social security taxes; and (12) the intention of the parties.

*Id.* at 123 (internal citations omitted).

Here, it is a close question whether Plaintiffs should be considered employees under the statute. Plaintiffs contend that they are employees, as "Defendants controlled Plaintiffs' work, Plaintiffs served in vital roles for Defendants, Plaintiffs worked exclusively for Defendants during the relevant time period, Plaintiffs were wholly dependent on Defendants for their income, and Plaintiffs were functionally integrated in POT's business, and ran the everyday operations of the organization" for the period their contracts were active. Dkt. 163 at 15. Defendants—in addition to other arguments, *see* Dkt. 164 at 16–17—respond that "Plaintiffs worked remotely from New Jersey with hardly any supervision or input from Ms. Mathre;"[19] were never provided with equipment, employee fringe benefits, or social security; and were short-term employees. *Id.* at 16–17. As a result of these conflicting facts, whether Plaintiffs are employees under CEPA presents a triable issue; a reasonable juror could find—based on the facts in the case—that the twelve factors presented above weigh in favor of either employee or non-employee status.

In addition to disputing whether Plaintiffs are employees under CEPA, Defendants posit that Plaintiffs are not members of the class CEPA was designed to protect—i.e., corporate whistleblowers. Dkt. 164 at 17. However, there is a genuine dispute of material fact as to whether Plaintiffs reported POT's noncompliance with federal and state law and were fired for doing so, *see id.* at 4, 19; Dkt. 157 at 17, so this too is an issue for a jury.

---

[19] Dkt. 164 at 15–16 (citing *id.* (Ex. C) at 110:10–16; *Greenman v. City of Hackensack*, 486 F. Supp. 3d 811, 832 (D.N.J. 2020)); *see also* Dkt. 157 at 29 (Plaintiffs explaining that they "were two of the three members of the Executive Committee that essentially ran POT").

Finally, Defendants aver that Plaintiffs' CEPA claim fails because Plaintiffs have not shown they were retaliated against by any of the Defendants, but again, this is a triable issue. Mathre terminated Plaintiffs, and in addition to raising performance-related issues, she also flagged to the Board various compliance-related issues Plaintiffs had identified. Dkt. 159 (Ex. 14) at 3; *id.* (Ex. 15) at 2–8; *id.* (Ex. 16) at 3–4; *id.* (Ex. 28). Thus, a reasonable juror could conclude Plaintiffs were terminated for whistleblowing or for performance-related reasons, making summary judgment inappropriate for this claim.

In sum, the Court will deny the summary judgment motions regarding Plaintiffs' CEPA claim, as it presents issues best resolved by a jury.

> iii. It is unclear whether Defendants breached their contracts with Plaintiffs, so summary judgment will be denied as to Plaintiffs' breach of contract claim.

Plaintiffs' final claim is that POT breached its contracts with Plaintiffs.[20] Plaintiffs assert that Defendants have "admit[ted] every material fact offered by Plaintiffs" in support of their breach of contract claim. Dkt. 166 at 6. Specifically, Plaintiffs point out that Defendants acknowledge "the existence of a contract, a promise to pay Plaintiffs when POT had the funds to do so, and the failure to pay Plaintiffs when POT had substantial funds to do so after POT's 2019 Annual Conference." *Id.*

In response, Defendants rely heavily on the invoicing clause in Plaintiffs' contracts. Dkt. 159 at 22–23. They point out that "Plaintiffs were paid by PO[]T for work for which they submitted invoices" and that, by not submitting invoices, it is "Plaintiffs, not PO[]T, who failed

---

[20] Plaintiffs also originally brought an unjust enrichment claim, but in their response to Defendants' motion for summary judgment, they consented to the dismissal of that count. Dkt. 163 at 26 n.22. They "similarly agree that their claims under the Fair Labor Standards Act should not be further pursued." *Id.*

to perform under the terms of the contracts" due to not fulfilling a contractual prerequisite. *Id.* at 22–24. Finally, Defendants criticize as insufficient the evidence—deposition testimony and a "pencil-marked calendar"—Plaintiffs have proffered in support of their hours of unpaid work. *Id.* at 24–25.

As the evidence is mixed on the issue whether Defendants failed to pay Plaintiffs for hours they worked, the parties' motions for summary judgment are denied. Plaintiffs' breach of contract claim should be resolved by a jury.

## II. The Virginia Nonstock Corporation Act protects POT's unpaid directors.

In addition to the above arguments, Defendants raise an affirmative defense;[21] they claim that the unpaid Defendant Directors have immunity from Plaintiffs' claims under the Virginia Nonstock Corporation Act ("VNCA"). Defendants are correct.

Whether VNCA immunity exists in the present case hinges on whether Virginia or New Jersey law applies. Defendants' VNCA argument was not addressed in this Court's earlier order. *Cf.* Dkt. 66. Therefore, the Court must conduct a new choice of law analysis. Notably, "New Jersey's choice of law rules incorporate the doctrine of depecage whereby the laws of different states may apply in the same case to different issues in the case." *In re Consolidated Parlodel Litig.*, 182 F.R.D. 441, 448 (D.N.J. 1998) (citations omitted). So, the fact that the Court earlier applied New Jersey law to Plaintiffs' substantive claims does not require New Jersey law to

---

[21] Seeking to head Defendants off, Plaintiffs contend that the VNCA should not apply because Defendants' VNCA affirmative defense was asserted for the first time at the summary judgment stage, and when that happens, "the defendant must adduce evidence which supports the existence of each element of its affirmative defense, and the evidence must be so powerful that no reasonable jury would be free to disbelieve it." *Herndon v. Mass. Gen. Life Ins. Co.*, 28 F. Supp. 2d 379, 382 (W.D. Va. 1998) (internal citations and quotation marks omitted). But as discussed below, *see* discussion *infra* p. 18, the elements of the affirmative defense are clearly met. Plaintiffs' argument is not persuasive.

apply to all aspects of the case. Rather, another state's law may govern other issues, such as affirmative defenses. The Court may conduct its choice of law analysis unencumbered.

When federal jurisdiction is based on diversity of citizenship, as is the case here, a court typically applies the choice of law rules for the state in which it sits. *Liberty Ins. Underwriters, Inc. v. Beaufurn*, 406 F. Supp. 3d 498, 505 (M.D.N.C. 2019). But when a party is granted a venue transfer under 28 U.S.C. § 1404(a), the transferee court applies the choice of law rules of the transferor court. *Id.* And New Jersey—the forum of the transferor court in the present matter—subscribes to the "two-pronged 'most significant relationship' test of the Restatement (Second) of Conflict of Laws." *Curtiss-Wright Corp. v. Rodney Hunt Co., Inc.*, 1 F. Supp. 3d 277, 283 (D.N.J. 2014) (citing *P.V. v. Camp Jaycee*, 197 N.J. 132, 142–43 (2008)). Under the most significant relationship test, a court considers (1) whether a conflict exists between the laws of the interested states and (2) each state's interest in resolving the specific issue in dispute. *Id.*

Here, Virginia and New Jersey law conflict. The VNCA grants unpaid directors *complete immunity* in all civil proceedings except when an officer or director has "engaged in willful misconduct or a knowing violation of the criminal law." Va. Code Ann. § 13.1-870.1(B–C). New Jersey, on the other hand, has a similar but more limited statute. The New Jersey Charitable Immunity Act, N.J. Stat. § 2A:53A-7 *et seq.*, protects nonprofits and their directors, officers, and employees from *negligence* claims. *Thompson v. Princeton Univ.*, No. 05-314 (MLC), 2005 WL 2044870, at *2 (D.N.J. Aug. 24, 2005). No doubt, the goal of these two statutes might be similar, *see* Dkt. 165 at 4, but the difference in the scope of immunity creates a conflict.

As a conflict exists between the VNCA and the New Jersey Charitable Immunity Act, the dispositive question is which state has the greater interest in this dispute. In making this determination, the Court examines which "state [has] the strongest [Restatement (Second) of

Conflict of Laws] section 145 contacts" as "[v]iewed through the section 6 prism." *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008). Specifically, section 145 inquires into: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation[,] and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145 (1971); *see also id.* § 168 (noting that § 145 applies to issues of charitable immunity).

These factors—taken in isolation—slightly favor Virginia. On one side of the ledger is the fact that Plaintiffs' injuries—unpaid wages and employment termination—occurred in New Jersey. Dkt. 163 at 11 n.10. On the other side of the ledger, the conduct leading to Plaintiffs' injuries mostly transpired in Virginia, and the relationship between Defendant Directors and Plaintiffs was centered in Virginia. First, Mathre—a Virginia resident who worked from her home there—acted on behalf of a Virginia nonprofit in firing Plaintiffs and allegedly retaliating against them. Dkt. 165 at 12. So, the conduct leading to Plaintiffs' injuries substantially occurred in Virginia. Furthermore, the Defendant Directors' relationship with Plaintiffs was channeled through and centered around a Virginia nonprofit. The record indicates that Plaintiffs rarely, if ever, interacted with Defendant Directors personally. Dkt. 159 (Ex. 1) ¶¶ 3–4; *id.* (Ex. 2) ¶¶ 3–4; *id.* (Ex. 3) ¶¶ 3–4; *id.* (Ex. 4) ¶¶ 3–4. Rather, POT was the conduit through which the parties conducted business. Thus, this factor is—at minimum—ambiguous and—at most—favorable to Virginia.[22]

---

[22] The parties' domiciles favor neither side. Plaintiffs are domiciled in New Jersey, POT and Mathre are domiciled in Virginia, and the other parties are domiciled in other states. Amend. Compl. ¶¶ 1–3; Dkt. 159 (Ex. 11) at 6:23–25.

However, when these factors are viewed through the prism of section 6 of the Restatement, they take on a different dimension, pointing strongly in favor of Virginia law. Section 6 examines:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2)(a–g) (1971). In the present matter, Defendant Directors agreed to serve—without pay—on the board of a Virginia nonprofit.[23] It would be entirely reasonable for parties, like Defendant Directors, to assume that a Virginia nonprofit would be governed by Virginia law, including the VNCA. Defendant Directors' relationship with Plaintiffs, after all, was centered around the operations of a Virginia nonprofit. Thus, applying Virginia's immunity for unpaid nonprofit directors in the case at hand would protect Defendant Directors' justified expectations. Restatement (Second) of Conflict of Laws § 6(2)(d) (1971). Further, determining that Virginia's nonprofit immunity statute applies, by default, to most cases involving a Virginia nonprofit would serve "predictability and uniformity of result" and "ease in the determination and application of the law to be applied." *Id.* § 6(2)(f–g). Unpaid directors of a Virginia nonprofit should not lose immunity conferred by Virginia law just because a suit is (at least initially) brought in another state. The policy underlying the VNCA—and, for that matter, the New Jersey Charitable Immunity Act—is to protect the unpaid directors of in-state

---

[23] Amend. Compl. ¶ 3; Dkt. 159 (Ex. 1) ¶ 7; *id.* (Ex. 2) ¶ 6; *id.* (Ex. 3) ¶ 7; *id.* (Ex. 4) ¶ 6.

nonprofits. Those protections should not be permitted to be skirted so easily. Accordingly, the Court concludes that the VNCA should apply to the Defendant Directors in this case.

Having determined that the VNCA bears on this case, the final question is whether Defendant Directors are actually covered by the VNCA. Under the statute, unpaid officers and directors are immune from liability in all civil proceedings except when they have "engaged in willful misconduct or a knowing violation of the criminal law." Va. Code Ann. § 13.1-870.1(B–C).[24] The VNCA does not define "willful misconduct," but in other employment-related disputes, the Supreme Court of Virginia has defined "willful" as "with deliberate intent." *See Layne v. Crist Elec.*, 768 S.E.2d 261, 267 (Va. Ct. App. 2015) (discussing relevant Supreme Court of Virginia cases). And "misconduct" has been construed as "perform[ing a] forbidden act." *Riverside & Dan River Cotton Mills v. Thaxton*, 161 Va. 863, 871–72 (1934).

In the present case, Defendant Directors did not intentionally take any action in furtherance of a forbidden act. They merely abstained from intervening on Plaintiffs' behalf. No doubt, Plaintiffs feel aggrieved by Defendant Directors' passivity, viewing it as a failure to manage POT effectively. *See* Dkt. 163 at 9–10. But Defendant Directors' inaction does not rise to the level of willful misconduct, particularly as there is no evidence that it was intentional.[25] It follows that Defendant Directors are protected by the VNCA and should be granted immunity.

---

[24] Plaintiffs do not allege that Defendant Directors knowingly violated criminal law, but they do allege that Defendant Directors engaged in willful misconduct. *Cf.* Dkt. 163 at 17–25.

[25] Plaintiffs do allege that "Dreher, prior to her joining the board on May 7, 2019, and as a board member, willfully facilitated and participated in the retaliatory firing of Plaintiffs," Dkt. 163 at 21, but the actions about which Plaintiffs principally complain occurred prior to Dreher joining POT's board. *See id.* Indeed, Dreher was not formally associated with POT at that time. Dkt. 157 (Ex. M). As a result, even if her actions were willful, she could not be held responsible for POT's conduct.

## CONCLUSION

For the above reasons, Plaintiffs' motion for summary judgment is **GRANTED** on the issue of liability as to their New Jersey Wage Payment Law claim but **DENIED** as to their other claims. Dkt. 157. Defendants' motion for summary judgment is **GRANTED** as to the Virginia Nonstock Corporation Act but **DENIED** in all other respects. Dkt. 158. Accordingly, Michael Aldrich, Denis Petro, Irvin Rosenfeld, Melanie Dreher, and Dustin Sulak are **DISMISSED** from this case.

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion & Order to all counsel of record.

Entered this 1st day of September, 2023

*[signature]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE